1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                        **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   **ROBERT MICHAEL FUSON,**                          CV 06-0424 H (WMc)

12                                 **Petitioner**       **REPORT AND**
                                                        **RECOMMENDATION OF**
13                        **v.**                        **UNITED STATES MAGISTRATE**
                                                        **JUDGE RE DENIAL OF**
14                                                      **PETITION FOR WRIT OF**
     **RODERICK Q. HICKMAN, DIRECTOR**                  **HABEAS CORPUS**
15   **OF THE CALIFORNIA DEPARTMENT**
     **OF CORRECTIONS**
16
                                 **Respondent**
17
                          **and**
18
     **BILL LOCKYER,**
19   **THE ATTORNEY GENERAL OF THE**
     **STATE OF CALIFORNIA**
20
                          **Additional Respondent**
21

22
                                      **I.**
23
                              **INTRODUCTION**
24
         Robert Michael Fuson ("Petitioner"), a state prisoner, brings this Petition for Writ of
25
     Habeas Corpus ("Petition") pursuant to 28 U.S.C. section 2254 challenging his San Diego
26
     Superior Court conviction in case number SCD163400 .  Petitioner raises the following claims in
27
     support of his Petition: (1) failure to give *Miranda* warnings before custodial interrogation violated
28
     Fifth Amendment right against self-incrimination; (2) failure to honor unequivocal and

                                      - 1 -                                   06-0424

1  unambiguous request for counsel violated Fifth Amendment right to counsel; (3) allowing a

2  witness to testify while obscuring her face with her hand violated Sixth Amendment right to

3  confrontation and Fourteenth Amendment right to due process; (4) aggregate, consecutive

4  sentence of ninety years to life violated Eighth Amendment prohibition against cruel and unusual

5  punishment; and (5) consecutive and upper terms imposed without submitting necessary factual

6  findings to the jury violated Sixth Amendment right to jury trial.

7        After reviewing the Petition, Respondent's Answer and supporting Memorandum of Points

8  and Authorities ("Answer"), Petitioner's Traverse and supporting Memorandum of Points and

9  Authorities ("Traverse"), and all supporting documents submitted by the parties, **IT IS**

10 **RECOMMENDED** that the Petition be **DENIED** for the reasons set forth below.

11                                        **II.**

12                        **STATE COURT PROCEEDINGS**

13       On March 1, 2002, the San Diego County District Attorney's Office filed a twenty count

14 Information against Petitioner in San Diego Superior Court.  (Lodgment No. 1 at 1-10.)  The

15 Information consisted of twenty counts of committing lewd acts upon a child (CAL. PENAL CODE §

16 288(a)).  (*Id.*)  Fifteen of the counts alleged Petitioner had substantial sexual contact with a victim

17 under fourteen years of age during the commission of the offenses (CAL. PENAL CODE §

18 1203.066(a)(8)), while all twenty counts alleged Petitioner committed the offenses against multiple

19 victims (CAL. PENAL CODE § 667.61(b), (c), (e)).  (*Id.*)  A jury convicted Petitioner of twenty

20 counts of committing a lewd act upon a child (CAL. PENAL CODE § 288(a)) and found true the

21 allegations that he had committed the charged offenses against more than one victim (CAL. PENAL

22 CODE § 667.61(b), (c), (e)(5)).  (Clerk's Transcript ["CT"] at 292-311.)  The jury further found that

23 Petitioner had substantial sexual contact with a victim under fourteen during the commission of

24 fourteen of the alleged offenses (CAL. PENAL CODE § 1203.066(a)(8)).  (*Id.*)  On August 29, 2002,

25 the Court sentenced Petitioner to a prison term of ninety years to life, consisting of six consecutive

26 fifteen to life terms and upper terms of eight years for the remaining counts to be served

27 concurrently with each other and concurrently with the indeterminate terms.  (CT at 316.)

28       On September 5, 2002, Petitioner filed a Notice of Appeal with the California Court of

1   Appeal, Fourth Appellate District, Division One.  (CT at 261.)  On November 30, 2004 the state

2   appellate court affirmed the judgment, modifying it to strike the restitution order of $1,918.98 to the

3   Chula Vista Police Department.  (Lodgment No. 2 at 3.)

4         On March 16, 2005 the California Supreme Court denied Petitioner's petition for review.

5   (Lodgment No. 4.)

6                                              **III.**

7                          **FEDERAL COURT PROCEEDINGS**

8         On February 23, 2006, Petitioner filed the instant Petition in this Court.  On April 25, 2006,

9   Respondent filed an Answer to the Petition along with a Memorandum of Points and Authorities.

10  On April 26, 2006, Respondent also lodged documents with the court.  On May 26, 2006, Petitioner

11  filed a Traverse along with a Memorandum of Points and Authorities.

12                                             **IV.**

13                         **STATEMENT OF FACTS**

14        Title 28, United States Code, section 2254, subsection (e)(1) provides:  "[A] determination

15  of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).

16  The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing

17  evidence."  *Id.*; *see also Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc) *overruled*

18  *on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997) (stating that federal courts are required

19  to "give great deference to the state court's factual findings.")  The following facts are taken from

20  the California Court of Appeal's opinion in Petitioner's direct appeal.

21        Petitioner has four daughters from two marriages. His first daughter, A., was 12 years old at

22  the time his first marriage ended in 1981.  Petitioner and his second wife had three daughters: R.M.,

23  R., and R.L., each born between 1986 and 1990.  After that time, Petitioner's wife worked and he

24

25  remained home to care for their daughters.

26        On October 23, 2001, Chula Vista police sergeant John McAvenia ("McAvenia") received a

27  call from Child Protective Services regarding allegations that Petitioner had been molesting two of

28  his daughters.  McAvenia called Petitioner and, using the pretext of his daughter getting into an

altercation at school, asked Petitioner to come to the police station to discuss the matter.  Detectives in civilian clothes and unmarked cars were sent to the area of Petitioner's home to observe his actions as he came to the police station.

When Petitioner arrived at the station, McAvenia took him to his private office as all of the interview rooms were being used.  The office was small and contained a refrigerator, coffee maker, desk, and two chairs.  The office also had windows that looked out into a larger office area where police personnel and civilians wearing plain clothes could be seen.  McAvenia was seated behind the desk and Petitioner was seated in the chair closest to the door, which locked people out, but not in.  McAvenia used a hidden micro cassette recorder to record the interview which lasted for approximately ninety minutes.

McAvenia began the interview by telling Petitioner that  he was the focus of an investigation into some pretty serious allegations which could result in charges.  McAvenia also explained that Petitioner was not under arrest and that the police wished to investigate the matter to see if there was anything to the charges.  Petitioner initially stated that he was not going to address anything without an attorney because of his prior dealings with CPS.  McAvenia said that was okay and asked if CPS had contacted Petitioner.  Petitioner continued talking, explaining that he understood how CPS allegations worked, to which McAvenia responded he was just letting Petitioner know why he was there.  Petitioner then stated that he could "deal with it," but "there's nothing I can say, at this point without an attorney's advice."  (Lodgment No. 2, People v. Fuson, No. SCD163400, slip op. at 20.)  McAvenia responded, "That's obviously your right and that's the way, we respect that."  (Id.)  Petitioner then stated, "If you wanna interview me, go ahead.  I don't care.  I don't care."  (Id.)  McAvenia repeated that if Petitioner wanted an attorney it was his right and he was "not here to talk [Petitioner] out of requesting . . . ."  (Id.)  McAvenia then, in response to Petitioner's claim of not being able to afford an attorney, said "well, we can get one appointed

for you.  That's the law."  *(Id.)*  McAvenia then reiterated that there were serious allegations and Petitioner continued talking.

About ten minutes into the interview, Detective Ruth Hinzman ("Hinzman") came into the room.  At this point, Petitioner moved from the chair nearest the door to the other chair across from McAvenia.  Both Hinzman and McAvenia were wearing plain clothes and neither had a badge or gun visible.  McAvenia updated Hinzman about Petitioner's request for an attorney because of his concerns about CPS and informed her that Petitioner "can't afford a lawyer and I said well you don't have to talk without [a] lawyer, we can get him one."  *(Id.* at 21.)  Hinzman then questioned Petitioner about his understanding that the court will appoint an attorney for him and Petitioner stated that he understood.  Hinzman then told him, "Well you know you're, you understand you're free to leave at any time.  And you don't have to talk to me."  *(Id.)*  Petitioner stated, "I don't wanna leave.  I wanna take care of my kids.  I want my girls safe."  *(Id.)*  McAvenia then again advised Petitioner about the allegations stating:

> [I]n the scope of the way these investigations usually go, because there has been some disclosure by both of them, again separately and apart from each other, it would look like you'd probably end up getting charged with a child molestation charge, lewd and lascivious act with a child under the age of fourteen. And I don't know if that's what's gonna' happen but it's a possibility. And if that's the case, then what happens is your daughters are pretty much compelled to tell what it is they've been saying [and] why. And if there's some reason why they're making stuff up against you, then that's our job to find out what that's all about. If in fact it's been goin' on, and they stick to their stories, then that's our job also. This is our one chance to hear your side of what may or may not have been going on or what, what this might be all stemming from. We're not here to deprive you of your rights. If you want a lawyer, we're gonna' stop talkin' to you.  But if there is somethin' goin' on we need to understand it better, and this is what we'd like to hear.

*(Id.)*

Later in the interview, Hinzman again asked Petitioner if he was okay talking with her about the investigation.  He responded, "Yeah," explaining that "[a]ll a lawyer can do is sit here and say,

don't answer that, don't answer that, don't answer that."  Hinzman then told Petitioner:

> You're in control of what we talk about. Okay? If I ask you a question and you don't
> wanna' answer it, all you have to do is say, I don't wanna' answer it.  If I ask you
> another question and you feel comfortable answering it, then you can answer it.
> You're in control of this conversation.  Okay?

(*Id*. at 22.)  When Petitioner again said "okay . . . lemme explain," Hinzman yet again asked if he "fully [understood]."  (*Id*. at 22.)  Petitioner stated he understood "how interrogation, quote, interviews, work," that he understood police work and a lot of things because he had "lots of associates . . . in law enforcement," and lots of education in "different disciplines."  (*Id*.)  When Petitioner later said he was not going to contest anything his daughters said, that he was not going to put them in that position, and asked if the detectives wanted him to confess to something he did not do, they said "no," they just wanted him to tell the truth and to be honest with them.  Later McAvenia further explained that he did not want Petitioner to just confess and be done with it because he'd like to know Petitioner's version of the facts and "if it looks to me like the daughters got together, then it's out."  (*Id*.)  Petitioner then said he had no idea what went on as far as the investigation, but he knew how interrogations worked and he did not care, stating "If I did I wouldn't, I wouldn't of spoken to you. I would still be getting a lawyer."  (*Id*. at 22-23)  He then stated if "[I] honestly felt [I] had anything to . . . hide, or anything to gain by hiding, we wouldn't be holding this conversation."  (*Id*. at 23.)  At the end of the interview, Petitioner was taken into custody.

During Petitioner's trial, his daughter R.L., with Petitioner off to her right, began testifying with her right hand covering the right side of her face.  Defense counsel explained at a sidebar conference:

> Your honor, I'm certainly aware of the sensitivity of this child, of testimony from the

victim because this is her father, but she has her face covered, at least blocking her view from the defendant's point of view. I understand . . . what her emotions are. I'm also sensitive to the requirement that he have the opportunity to be confronted with his accuser. And I'm afraid this is kind of obscuring that issue because she is blocking her face. I think we can position her such that she doesn't have to see her father but he ought to be able to see her. We would just hate to have this raised at some other level by him, but he can't see the witness as she testifies. Basically for the record, what's she's done, she's facing towards the jury, the defendant is off to her extreme right, and she's taken her right hand and covering that side of her face obscuring his vision of her entire face.

(*Id*. at 35.)  Defense counsel then requested that the court tell R.L. to take her hand down, but the court denied the request.  R.L. was then questioned in open court on direct examination, cross-examination, redirect, and recross without further objection.

Petitioner was convicted and sentenced to a prison term of ninety years to life, consisting of six consecutive fifteen to life terms and upper terms of eight years for the remaining counts to be served concurrently with each other and concurrently with the indeterminate terms.

## V.
## STANDARD

Title 28, United States Code, § 2254, sets forth the following scope of review for federal habeas corpus claims:[1]

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
> [...]
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

---

[1]Title 28, United States Code, § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to habeas corpus petitions filed after 1996. *See Lindh v. Murphy*, 521 U.S. 320 (1997).  The current Petition was filed on February 23, 2006, and is therefore governed by the AEDPA.

adjudication of the claim—
  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(a), (d)(1)-(2).

When determining what "clearly established federal law" is under section 2254(d)(1), federal courts look to United States Supreme Court holdings at the time of the state court's decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Ninth Circuit law may also be considered for "its persuasive authority in applying Supreme Court law." *Van Tran v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir. 2000), *overruled on other grounds*, *Lockyer*, 538 U.S. 63; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *cert. denied*, 540 U.S. 968 (2003).

A state court's decision is "contrary to" clearly established United States Supreme Court precedent if (1) the state court applies a rule different from the governing law set forth in Supreme Court cases, or (2) the state court confronts a set of facts that are materially indistinguishable from a Supreme Court case, but still reaches a different result. *Williams*, 529 U.S. at 405-06, 412; *Bell v. Cone*, 535 U.S. 685, 694 (2002); *Lockyer*, 538 U.S. at 73; *Clark*, 331 F. 3d at 1067. A state court decision does not have to cite to or even demonstrate an awareness of clearly established Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002).

A state court decision may involve an "unreasonable application" of Supreme Court precedent, "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. Alternatively, an unreasonable application may be found, "if the state court either

unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Clark*, 331 F.3d at 1067.  An unreasonable application of federal law requires the state court decision to be more than incorrect or erroneous. *Lockyer*, 538 U.S. at 76.  Instead, the state court's application must be "objectively unreasonable." *Id.*

When there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state-court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003).  If the dispositive state court order does not "furnish a basis for its reasoning," however, federal habeas courts must conduct an independent review of the record to determine whether the state court unreasonably applied controlling federal law. *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes v. Thompson*, 336 F.3d 848. 853 (9th Cir. 2003).

**VI.**
**DISCUSSION**

**A.   Petitioner's Fifth Amendment right against self-incrimination was not violated by the failure to give him *Miranda* warnings because he was not in custody at the time of his police interview.**

Petitioner claims that his motion to suppress statements to police should have been granted because his Fifth Amendment right against self-incrimination was violated when officers conducted a custodial interrogation without advising him of his *Miranda* rights.  (Petition at 6.)  Petitioner contends that police lured him to the station by falsely telling him that his daughter was in an altercation at school and that he was followed to the station by plainclothes detectives.  (Traverse at

3.)  Petitioner further claims that when he arrived at the station, he was brought into a "cramped, windowless office in the interior of the station" and told that allegations had been made that he had touched his children sexually.  (*Id.*)  Petitioner then claims that a second detective entered the room, blocking his path to the door.  (Petition at 6.)  Based on the totality of the circumstances, Petitioner asserts that a reasonable person would have felt like he was in custody.  (Traverse at 3.)

Respondent contends that Petitioner came to the police station voluntarily–although admittedly a ruse was employed.  (Answer at 17.)  Further, Respondent claims that Petitioner was told from the outset of the interview that he was not under arrest, he was in control of the discussion and the questions he answered, and he could terminate the conversation and leave.  (*Id.*)  Respondent also asserts that both detectives maintained "matter-of-fact, low key demeanors throughout, and were polite and courteous at all times."  (*Id.*)  Based on these facts, Respondent asserts that a reasonable person would not have felt like he was in custody.  (*Id.*)

*Miranda* warnings are required for a person questioned by police after being "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  The ultimate inquiry into whether custody has attached is "simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983).  *Miranda* warnings are not required simply because the questioning takes place at a police station or because the questioned person is the one whom the police suspect.  *Id.*  Instead, the court must evaluate all of the circumstances surrounding the questioning and determine whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Once a suspect is in custody and has invoked the right to silence or the right to an attorney,

the invocation must be scrupulously honored. *Miranda*, 384 U.S. at 478-79. Neither right may be invoked, however, anticipatorily–that is, before or outside of the context of custodial interrogation. *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991).

In *Oregon v. Mathiason*, the defendant, responding to a card left at his door, called police and agreed to meet with an officer at the police station. *Oregon v. Mathiason*, 429 U.S. 492, 493 (1977). When the defendant arrived, he was met by an officer, taken into an office, and interviewed with the door closed. *Id*. The officer informed the defendant he was not under arrest, but that police suspected he was involved in a burglary. *Id*. The officer then falsely told the defendant that his fingerprints were found at the scene of the crime. *Id*. After just five minutes of being in the office, the defendant confessed and was allowed to leave thirty minutes after questioning began. *Id*. at 493-94. The Supreme Court held that the defendant was not in custody during the interview as he had arrived voluntarily, was immediately told he was not under arrest, and was allowed to leave after thirty minutes. *Id*. at 495; *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (holding no custody where defendant came to police station voluntarily, was told he was not under arrest, and left in less than thirty minutes); *see also Yarborough v. Alvarado*, 541 U.S. 652 (2004) (stating that factors weighing in favor of no custody were that the police did not transport the defendant to the station and did not threaten him with arrest). The Court explained that *Miranda* warnings are not required just because questioning takes place at the station house or because the questioned person is a suspect. *Id*. The Court also stated that the false statement by police about finding the defendant's fingerprints had no bearing on the custody determination. *Id*. at 495-96.

In the present case, the state appellate court's holding that, based on the totality of the circumstances, Petitioner was *not* in custody for Fifth Amendment purposes is not contrary to, or an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court. Although Petitioner came to the police station based on the false story that his daughter was

injured, he came voluntarily, just like the defendant in *Yarborough*, rather than being brought by police.  Further, the false story about Petitioner's daughter is similar to the police officer's false statement in *Mathiason* that the defendant's fingerprints were found at the scene of the crime, which the Supreme Court stated had no bearing on the custody determination.  Also, the room Petitioner was taken into was not a sterile interview room.  Rather, it was a private office that contained a refrigerator and coffee maker and had windows that looked out into a larger business type office.  Petitioner also initially sat next to the door, which was unlocked from the inside, and only moved when Detective Hinzman entered the room.

Furthermore, at the outset of the interview, Sergeant McAvenia told Petitioner he was not under arrest, akin to the situations in *Mathiason* and *Beheler*.  The interview then proceeded for about ninety minutes, but the detectives maintained a casual tone throughout the interview and refrained from making threats, similar to the detectives in *Yarborough*.  Throughout the interview, Petitioner was repeatedly told that he did not have to talk, he was free to leave, he did not have to answer any questions he did not want to answer, and he could have an attorney present.  Sergeant McAvenia did tell Petitioner that he was the focus of an investigation into some "pretty serious allegations" and that charges may be filed.  However, the Supreme Court has held in an analogous situation that custody was not established where police informed the defendant he was a suspect in a burglary.  *Mathiason*, 429 U.S. at 493, 495.

**B.**    **Petitioner's Fifth Amendment right to counsel was not violated because his attempt to invoke the right occurred before he was in custody and was therefore ineffective.**

Petitioner claims that his Fifth Amendment right to counsel was violated when, after he was confronted with serious allegations of sexual misconduct, he was not provided a lawyer despite informing detectives that he did not wish to speak without a lawyer present.  (Petition at 7.)  Petitioner alleges that the conversation then continued and he restated that he was not going to

address anything without an attorney.  (*Id*.)  Instead of ending the interview, Petitioner claims that police continued talking to him for ninety minutes before arresting him.  (*Id*.)

Respondent claims that Petitioner's requests for counsel were ineffective because he was not in custody at the time of the requests.  (Answer at 18.)  Respondent further asserts that because Petitioner could not invoke *Miranda* anticipatorily, his Fifth Amendment right to counsel was not violated.  (*Id*.)

The United States Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than custodial interrogation."  *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991).  Therefore, because Petitioner was not in custody during his police interview, as discussed in Part A, *supra*, the state appellate court's determination that Petitioner's Fifth Amendment right to counsel was not violated is not contrary to, or an unreasonable application of, clearly established federal law as established by the Supreme Court.

**C.     Petitioner's sentence does not violate the Sixth Amendment prohibition against cruel and unusual punishment.**

Petitioner claims that the ninety year to life sentence that he received is cruel and unusual in violation of the Eighth Amendment.  (Petition at 9.)  He argues that the sentence is improper because the aggregate time "far exceeded the amount of time he would have received if he had been convicted of first degree murder."  (Traverse at 19.)  He further claims that even multiple sex offenses should not impose a sentence greater than the "taking of a single human life."  (*Id*. at 20.)

Respondent argues that Petitioner's sentence is not cruel or unusual because he committed multiple sex offenses against multiple victims on multiple occasions.  (Answer at 24.)  Respondent further contends that sexual acts upon minors are "highly repugnant", can have long-lasting effects, and are especially heinous because Petitioner committed the crimes against his own daughters.  (*Id*. at 24-25.)

*Harmelin v. Michigan* is a leading U.S. Supreme Court case discussing proportionality under the Eighth Amendment.  Although *Harmelin* does not provide a majority opinion setting forth the exact Eighth Amendment proportionality requirement, seven Justices agreed that, at the very least, grossly disproportionate sentences are prohibited.[2]  However, "the relative lack of objective standards concerning terms of imprisonment has meant that "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [are] exceedingly rare." *Harmelin*, 501 U.S. at 1001 (Kennedy, J., concurring).  In *Harmelin*, the Supreme Court held that a life sentence without the possibility of parole for the possession of 672 grams of cocaine was not cruel and unusual.  *Id.* at 961, 996.

The Supreme Court has further upheld serious sentences for less serious crimes than in the present case, as in *Rummell v. Estelle*, where the Court held valid a life sentence for the commission of three felonies over the course of nine years.  *Rummell v. Estelle*, 445 U.S. 263, 265-66 (1980).  The felonies were fraudulently using a credit card to obtain $80 worth of goods or services, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses.  *Id.*; *see also Hutto v. Davis*, 454 U.S. 370, 370-72 (rejecting Eighth Amendment challenge to forty year sentence for possession and distribution of less than nine ounces of marijuana).

---

[2] Justices Scalia and Rehnquist stated that the Eighth Amendment contains no proportionality guarantee.  *Harmelin v. Michigan*, 501 U.S. 957, 965 (1991).  Justices Kennedy, O'Connor, and Souter stated that the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Id.* at 1001 (Kennedy, J., concurring).  Justices White, Blackmun, Stevens, and Marshall believe

> The language of the [Eighth] Amendment does not refer to proportionality in so many words, but it does forbid "excessive fines," a restraint that suggests that a determination of excessiveness should be based at least in part on whether the fine imposed is disproportionate to the crime committed.  Nor would it be unreasonable to conclude that it would be both cruel and unusual . . . to impose any punishment that is grossly disproportionate to the offense for which the defendant has been convicted.

*Id.* at 1009-10 (White, J., dissenting).  The majority position rejected previous holdings such as in *Solem v. Helm*, where the Supreme Court held that a sentence must be proportionate to the crime for which the defendant has been convicted.  *Solem v. Helm*, 463 U.S. 277, 290 (1983).

1   Based on the holdings in *Harmelin, Rummell,* and *Hutto*, the state appellate court's holding

2   that Petitioner's sentence was not cruel and unusual is not contrary to, or an unreasonable

3   application of, clearly established federal law as determined by the Supreme Court.  The magnitude

4   of Petitioner's sexual offenses against his own daughters is far greater than the offenses committed

5   in the three aforementioned cases.  Further, Petitioner committed repeated offenses over a long

6   period of time, as did the defendant in *Rummell*, yet Petitioner's sentence is less severe than

7

8   Rummell's life sentence without parole.

9   **D.    Petitioner's Sixth Amendment right to confront witnesses was not violated when R.L.
        testified while obscuring her face from him using her hand**.

10

11   Petitioner claims that his Sixth Amendment right to confront witnesses and his Fourteenth

12   Amendment right to due process were violated because his daughter, R.L., testified at his trial while

13   shielding her face from Petitioner's view with her hand.  (Petition at 8.)  Petitioner claims that the

14   Sixth Amendment requires a "face-to-face meeting" to protect against false testimony and to give

15   the accused the opportunity to observe the witness's facial expression.  (Traverse 16-19.)

16

17   Respondent contends that there is no "absolute right to a face-to-face meeting with

18   witnesses."  (Answer at 19.)  Further, since no physical barrier or technological device was used to

19   insulate R.L. from the view of Petitioner, he was able to view her general demeanor.  (*Id*. at 21.)

20   Respondent also claims that R.L. was subject to cross-examination and that the jury was able to view

21   both Petitioner and R.L. and see both their reactions during her testimony.  (*Id*. at 21-22.)

22

23   The Confrontation Clause "ensure[s] the reliability of the evidence against a criminal

24   defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the

25   trier of fact."  *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  As the Supreme Court stated in that

26   case:

27

28   The primary object of the [confrontation clause] was to prevent depositions or ex

- 15 -                                          06-0424

1
2
3
4

> parte affidavits, such as were sometimes admitted in civil cases, being used against
> the prisoner in lieu of a personal examination and cross-examination of the witness
> in which the accused has an opportunity, not only of testing the recollection and
> sifting the conscience of the witness, but of compelling him to stand *face to face
> with the jury in order that they may look at him*, and judge by his demeanor upon the
> stand and the manner in which he gives his testimony whether he is worthy of belief.

5
6

*Id*. (emphasis added).  The right to a face-to-face confrontation is not an absolute right.  *Id*. at 844.

7
8

In *Craig*, the Supreme Court held that a statute allowing child witnesses to testify from a separate

9

room using closed-circuit television did not violate the Sixth Amendment right to confront

10

witnesses if a specific finding is made that the procedure is necessary to further an important state

11

interest.  *Id*. at 857.  The Court explained that the "'Confrontation Clause reflects a preference for

12

face-to-face confrontation' . . . a preference that 'must occasionally give way to considerations of

13

public policy and the necessities of the case.'" *Id*. at 849.  The Court further stated that, even

14
15

though the use of closed-circuit television prevented the witness from seeing the accused,

16
17
18

> Maryland's procedure preserves all of the other elements of the confrontation right:
> The child witness must be competent to testify and must testify under oath; the
> defendant retains full opportunity for contemporaneous cross-examination; and the
> judge, jury, and defendant are able to view (albeit by video monitor) the demeanor
> (and body) of the witness as he or she testifies.

19

*Id*.

20

In the present case, the state appellate court's holding that Petitioner's right to confront

21

witnesses was not violated is not contrary to, or an unreasonable application of, clearly established

22

law as determined by the Supreme Court.  All the elements of the right of confrontation present in

23
24

*Craig* are also present here, along with R.L.'s physical presence in the courtroom.  R.L. was

25

competent to testify and did testify under oath.  Petitioner had the full opportunity to conduct cross-

26

examination, and he did so, where he could test the recollection and sift the conscience of R.L.

27

Further, the judge, jury, and Petitioner were all able to view the demeanor of R.L. as she testified

28

and, unlike the witness in *Craig* who testified via closed-circuit television, R.L. was physically

present in the courtroom.

The present case is distinguishable from *Coy v. Iowa*, where the Supreme Court held that the accused's confrontation right was violated when a large screen was erected between the accused and two complaining witnesses, blocking him from their sight.[3] *Coy,* 487 U.S. at 1022.  Here, there was no physical barrier blocking R.L.'s view.  She was forced to sit in open court in a position where she could see Petitioner.  Although R.L. chose to shield her face from Petitioner, this action was part of her demeanor and within full view of the jury, which could then draw any necessary inferences from her conduct.  As the Supreme Court has stated, "The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions." *Id.* at 1019.  It would not be possible for the jury to draw such inferences with the use of a large screen, as in the *Coy* case, because the witness's view of the accused is blocked without any action on the part of the witness that the jury could consider as part of her demeanor.

**E.      Petitioner's Sixth Amendment right to jury trial was not violated by the imposition of consecutive and upper terms**.

Petitioner claims his Sixth Amendment right to a jury trial was violated by the court imposing concurrent upper terms of eight years as to fourteen counts based on three aggravating factors listed in the probation report.  (Petition at 9.)  Petitioner claims these factors were the basis for increasing his sentence beyond the statutory maximum, which violated his right to a jury trial because the factual issues presented by the three factors were never submitted to the jury.  (*Id.*)

Petitioner further claims that for three of the six counts for which the court imposed

---

[3] The Court explained that "the screen would enable appellant dimly to perceive the witnesses, but the witnesses to see him not at all." *Coy v. Iowa*, 487 U.S. 1012, 1015 (1988).

consecutive sentences of fifteen years to life, the sentence was based on an implied finding that the offenses were not committed "against a single victim during a single occasion." (*Id.*) Petitioner asserts that this implied finding violated his Sixth Amendment right to a jury trial because his sentence was increased beyond the statutory maximum without submitting the necessary facts to the jury. (*Id.*)

Respondent contends that the imposition of upper terms did not violate Petitioner's right to a jury trial because California Rules of Court, rule 4.421(a)(7) authorizes the imposition of upper terms when the defendant is sentenced to concurrent terms for other crimes where consecutive sentencing was available. (Answer at 27.) Respondent asserts that in this case, where Petitioner was sentenced concurrently on fourteen counts where consecutive sentencing was available, the Court can use the sentencing decision as an aggravating factor to impose upper terms on the remaining six counts. (*Id.*)

Respondent also argues that the imposition of consecutive sentences does not violate Petitioner's right to a jury trial because the verdict reflected findings that the crimes were committed against separate victims at different times and in different places. (*Id.* at 33.) Respondent claims that this is sufficient reason to impose consecutive terms as no additional fact-finding by the jury is required. (*Id.* at 34.) Respondent further asserts that neither the U.S. Supreme Court, nor any other court, has ever held that imposing consecutive terms is subject to the constitutional limitations of *Blakely v. Washington*, 542 U.S. 296 (2004).

In *Apprendi v. New Jersey*, the defendant was convicted of second degree possession of a firearm, which carried a potential prison sentence of five to ten years. *Apprendi v. New Jersey*, 530 U.S. 466, 469-70 (2000). The judge, however, relying on a New Jersey hate crime statute, imposed an enhanced sentence of twelve years after finding by a preponderance that the crime was

- 18 -                                                                                    06-0424

motivated by racial bias.[4]  *Id*. at 471.  The Supreme Court held that the imposition of a twelve year sentence violated the defendant's right to a jury trial stating that, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Id*. at 490.

Similarly in *Blakely v. Washington*, the defendant was convicted of second degree kidnaping with a firearm, which carried a standard sentence of forty-nine to fifty-three months. *Blakely*, 542 U.S. at 298-99.  The sentence could be increased, however, if the judge found "substantial and compelling reasons."  The judge in *Blakely*, after making a factual finding that the defendant acted with deliberate cruelty, imposed a sentence of ninety months.  *Id*. at 300.  The Supreme Court held that the sentence violated the defendant's right to a jury trial explaining that "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings."  *Id*. at 303-04. The Court explained that the facts stipulated to in the guilty plea only authorized the imposition of a fifty-three month standard sentence–therefore the judge had no authority to impose a ninety month sentence.  *Id*. at 304.

Petitioner's upper-term sentence as to six counts, in contrast to the facts in *Apprendi* and *Blakely*, did not involve judicial fact-finding beyond the jury verdict and is therefore not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  California Rules of Court, rule 4.421(a)(7) lists aggravating factors that can be used to enhance a sentence including, "the defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed."  In the present case, Petitioner was sentenced concurrently on fourteen counts where consecutive sentences

---

[4] The hate crime statute allowed imposition of a ten to twenty year prison term.  *Apprendi*, 530 U.S. at 469.

could have been imposed.  This fact can be used as an aggravating factor allowing for the imposition of upper terms on the remaining counts.  No additional fact-finding by the jury was required to make this determination, unlike the findings of racial bias in *Apprendi* or deliberate cruelty in *Blakely*.

Similarly, the imposition of consecutive sentences is not an unreasonable application of clearly established federal law as determined by the Supreme Court.  Both *Blakely* and *Apprendi* only dealt with "increas[ing] the penalty for a crime beyond the prescribed statutory maximum," not with the imposition of consecutive terms.  *Blakely*, 542 U.S. at 301; *accord Apprendi*, 530 U.S. at 476.  The *Apprendi* court specifically declined to address consecutive sentencing and focused on the imposition of an enhanced sentence on one particular count stating:

> It is appropriate to begin by explaining why certain aspects of the case are not relevant to the narrow issue that we must resolve. First, the State has argued that even without the trial judge's finding of racial bias, the judge could have imposed consecutive sentences on counts 3 and 18 that would have produced the 12-year term of imprisonment that Apprendi received; Apprendi's actual sentence was thus within the range authorized by statute for the three offenses to which he pleaded guilty. The constitutional question, however, is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum for the offense charged in that count. The finding is legally significant because it increased--indeed, it doubled--the maximum range within which the judge could exercise his discretion, converting what otherwise was a maximum 10-year sentence on that count into a minimum sentence. The sentences on counts 3 and 22 have no more relevance to our disposition than the dismissal of the remaining 18 counts.

*Apprendi*, 530 U.S. at 474.  Because neither *Apprendi*, *Blakely*, nor any other Supreme Court case deals with the Sixth Amendment implications of consecutive sentencing, Petitioner cannot establish an unreasonable application of federal law as determined by the U.S. Supreme Court.

**VII.**
**CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an

Order **DENYING** Petitioner's Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than **November 24, 2006** any party to this action may file a

written objection with the Court and serve a copy on all parties.  The document should be captioned

"Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court

and served on all parties no later than **December 11, 2006**.  The parties are advised that failure to

file objections within the specified time may result in a waiver of the right to raise those objections

on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *see also*

*Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

**DATED:  October 18, 2006**

**Hon. William McCurine, Jr.**
**U.S. Magistrate Judge**
**United States District Court**

cc: All Counsel and Parties of Record

06-0424