1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11   ROBERT MICHAEL FUSON,

12                                        Petitioner,

13        vs.

14   JAMES E. TILTON,[1] Secretary,
     California Department of Corrections,

15                                        Respondent.

16

CASE NO. 06-CV-0424 H (WMC)

**ORDER ADOPTING REPORT AND RECOMMENDATION AND DENYING PETITION FOR WRIT OF HABEAS CORPUS**

17        Petitioner Robert Michael Fuson, a state prisoner, filed a petition for a writ of

18   habeas corpus challenging his conviction and sentence pursuant to 28 U.S.C. § 2254

19   on February 23, 2006.  (Doc. Nos. 1, 2.)  Respondent filed an answer to the petition on

20   April 25, 2006.  (Doc. No. 5.)  Petitioner filed a traverse in support of his petition on

21   May 26, 2006.  (Doc. No. 9.)  On October 18, 2006, the magistrate judge issued a

22   report and recommendation denying the petition.  (Doc. No. 10.)  Petitioner filed

23   objections to the report and recommendation on November 20, 2006.  (Doc. No. 11.)

24   Respondent has not filed a reply to the objections.

25        For  the  reasons  stated  below,  the  Court  **ADOPTS**  the  report  and

26

27   [1] The Court sua sponte substitutes James E. Tilton, the current Secretary of the California
     Department of Corrections, in place of Roderick Q. Hickman, the former Secretary.  Additionally, the

28   Court DISMISSES former California Attorney General, and current State Treasurer, Bill Lockyer from
     this case as an improper party because he is not a proper respondent.  See Rule 2(a), 28 U.S.C. foll.
     § 2254 (state officer having custody of petitioner is proper respondent).

06cv0424

recommendation and **DENIES** Petitioner's petition for a writ of habeas corpus.

**Background**

**A.    State Proceedings**

March 1, 2002, the government filed a twenty count information against Petitioner in San Diego Superior Court (Superior Court Case No. SCD 163400), charging Petitioner with twenty counts of committing lewd acts upon a child under California Penal Code § 288(a). (Lodgment 1, Clerk's Transcript ("CT") at 1-10.) The government filed an amended indictment bringing the same charges on April 25, 2002. (Id. at 13-22.)  All of the counts alleged that Petitioner committed offenses against multiple victims pursuant to California Penal Code § 667.61(b), (c), (e). (Id.)  Further, fifteen of the counts alleged that Petitioner had substantial sexual contact with a victim under fourteen years of age during commission of the offenses pursuant to California Penal Code § 1203.066(a)(8).  (Id.)

A jury found Petitioner guilty on all counts.  (Id. at 292-311.)  The jury also found true the allegations that Petitioner committed the charged counts against multiple victims.  (Id.)  Further, as to counts 1 through 4, 7 through 12, and 15 through 18, the jury found that Petitioner had substantial sexual contact with a victim under fourteen during the commission of those offenses.  (Id.)

On August 29, 2002, the trial court sentenced Petitioner to a total prison term of 90 years to life, consisting of six consecutive 15 years to life terms and upper terms of eight years for the remaining counts to be served concurrently with each other and concurrently with the indeterminate terms.[2]  (Lodgment 1, Reporter's Transcript ("RT"), Volume 9 at 52.)

On September 5, 2002, Petitioner filed a notice of appeal with the California appellate court. (CT at 261.) On November 30, 2004, the state appellate court affirmed the judgment, modifying it to strike the restitution order of $1,918.98 to the Chula

---

[2] As noted by the California Court of Appeal, the abstract of judgment and sentencing hearing minutes incorrectly indicated a total prison term of 98 years to life. (CT at 315-17; Lodgment 2 at 3, 61.)

1   Vista Police Department and remanding for the trial court to correct the abstract of

2   judgment to reflect the correct total sentence of 90 years to life. (Lodgment 2 at 3, 61.)

3        Petitioner filed a petition for review before the California Supreme Court on

4   December 29, 2004. (Lodgment 3.) The California Supreme Court denied Petitioner's

5   petition for review on March 16, 2005. (Lodgment 4.)

6   **B.    Factual Background**

7        Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a

8   State court shall be presumed to be correct." A petitioner has the burden of rebutting

9   the presumption of correctness by clear and convincing evidence. 28 U.S.C.

10  § 2254(e)(1). The following facts are taken from the California Court of Appeal's

11  opinion affirming Petitioner's conviction in People v. Fuson, Case No. D040824 (Cal.

12  Ct. App. Nov. 30, 2004).

13         Fuson has four daughters from two marriages. His first daughter,
    A., was 12 years old at the time his first marriage ended in 1981. Fuson
14  and his second wife had three daughters: R.M., R., and R.L., each born
    between 1986 and 1990. Afterwards, Fuson's wife worked, and he
15  remained home to care for their daughters. In 2002, Fuson was charged
    with sexually molesting his three youngest daughters.
16         At trial, R.M. testified that when she was about 12 years old, Fuson
    began fondling her breasts and genitals, generally on Thursday evenings
17  while her mother was out of the house and her sisters had gone to bed.
    Most of the incidents took place in her bedroom. She could not recall the
18  number of incidents or distinguish each event, but she believed there were
    "quite a few," more than five. Fuson would usually sit on her bed, rub her
19  breasts, and then put her in various positions where he would insert his
    penis into her vagina. Fuson had also rubbed R.M.'s genitals with a
20  vibrator and had inserted it more than twice. One night, Fuson even licked
    and rubbed her genitals with his mouth. He had also touched her anus
21  once or twice. On one occasion, in which R.M. believed Fuson fully
    inserted himself into her vagina, she told him he was hurting her, but he
22  did not stop right away. R.M. considered Fuson aggressive that time, but
    said he otherwise moved calmly and slowly, and was fairly gentle during
23  the incidents. After another incident where he penetrated her with his
    penis, R.M. recalled Fuson explaining that he was "teaching" her.
24         R.M. further testified that some other incidents occurred in the
    living room, where Fuson would have her lay down on the couch with
25  him and he would alternately rub her breasts and genitals with one hand.
    On one occasion in the living room, Fuson asked her to touch his penis
26  and guided her hand to manipulate it. On another occasion, Fuson, who
    was wearing a nightgown, called R.M. into his bedroom and had her lean
27  over the bed while he removed her underwear and began massaging her
    genitals. He also rubbed his penis against her back and buttocks. When
28  they heard R.M.'s mother's van pull up, Fuson stopped and told R.M. to
    go back to bed.

Fuson generally told R.M. he would go to jail and she would never see him again if she ever told anyone about what had happened during the encounters. R.M. was concerned that what had happened to her had also happened to R. R.M. eventually told several of her teachers about the incidents and her concerns.

Fuson similarly began touching R. when she was 12 or 13 years old. She testified at trial that the incidents occurred "somewhere around" once a month over the course of about a year and half while her mother and R.M. were not at home and R.L. was watching television. R. explained it happened more than five times but she could not remember whether it happened more than 10 times. Although she could not recall each individual instance, in general Fuson would call her into his bedroom and rub her breasts and thighs. Fuson told R. he was teaching her. At times he would remove her lower clothing and touch her on the outside of her vagina with his penis and also slowly insert his penis inside her vagina, telling her that it was "supposed to feel good." When she felt pain, she asked him to stop and he would "back off a little" and pull out. On one occasion, Fuson asked her to touch his erect penis.

According to R., Fuson had also assisted her in inserting a tampon one time and then again helped her on another occasion to find her tampon and remove it. These incidents had nothing to do with the incidents that occurred in Fuson's bedroom.

One morning, possibly in May 2001, R. woke up and found her younger sister R.L. and Fuson on the floor of the living room, with R.L. crying and lying on her stomach with her nightshirt around her neck and Fuson kneeling between R.L.'s slightly spread legs. Although Fuson was facing R.L., he did not say anything to her. He just got up, walked into the kitchen and then back to his bedroom. R.L. got up on the couch and watched television. R. never talked to R.L. about what had happened that morning.

R.L. next testified that starting when she was in the 6th grade, Fuson began touching her while they were in his bedroom and also in the back bathroom. Fuson would remove both of their clothing and touch her chest and the inside and outside of her "lower front private part." He was gentle when he touched her on the inside. According to R.L., Fuson told her he was touching her to educate her. More than once, Fuson also touched the inside and outside of her vagina with his penis. When his penis was inside her, she could feel it moving and it hurt her.

Fuson also used a vibrator on R.L. more than once, showing her how to use it and inserting it in her vagina. He also touched her "back private part" with his penis while in the bathroom and bedroom. R.L. thought Fuson had also inserted his penis in her anus.

R.L. remembered that the same things that had happened in the bedroom and bathroom had also occurred at least once in the living room. There Fuson had touched her on her lower front private part with his hands and penis while she was unclothed on the floor. She could not recall R. entering the room during that incident.

In October 2001, after R.M. had reported the matter to several of her teachers, they contacted school authorities, who referred the matter to Child Protective Services (CPS). The next Monday, after detectives had interviewed R. and R.L., the police called Fuson at home and, as a ruse to get him out of the house so detectives could speak with R.M. who was home from school after foot surgery that day, told him that R.L. had gotten into some trouble at school and he needed to pick her up at the police station. When Fuson left the house to drive to the police station, detectives went to the home and interviewed R.M. about her reports of

- 4 -

molestation.

After arriving at the station, Fuson was interviewed by detectives. An audiotape of the interview was played at trial. Fuson told detectives he had raised his daughters as a "Mister Mom" who openly and completely taught them about sex, touching them only in an effort to educate them about sexuality. Fuson indicated that his "attitude about human sexuality [w]as different from the law;" that he "crossed the line" and "went beyond the law" when he physically taught each of his daughters how to masturbate, explaining he "would take her hand and physically teach her how to find that wonderful little spot...." In doing so, he often touched their vagina area with their hand and his own. He also taught his daughters about their body parts and their functions and how to use a dildo. Although Fuson denied engaging in intercourse with them, he conceded he may have placed his penis between R.'s legs while showing her what a condom was and how it was used. According to Fuson, he only inserted his finger into R.'s vagina in order to remove a tampon after she lost the string. Fuson denied any of the touching was done for his or his daughters sexual gratification. Fuson was arrested at the conclusion of the interview.

A pediatrician who had reviewed each girls' medical history and had performed genital examinations on them in October 2001 testified that each had normal examinations, which were consistent with their history of post-puberty intercourse. The pediatrician stated that the absence of injury on each girl's genitals could be explained in part by an estrogen effect which causes elasticity, and also by slow and gentle intercourse.

Fuson's daughter from his first marriage testified about earlier sexual incidents involving Fuson. A. said Fuson had touched her genital area and had digitally penetrated her vagina on several occasions in her bedroom when she was between 11 and 12 years old. Fuson had also made her perform oral sex on him. Fuson had told her that the touching was an educational experience.

Then when A. was 18 years old and visited Fuson's home for a week after R.'s birth to help Fuson's second wife with the care of the other girls, Fuson came into her room one night and tried to touch her. She told him to stop or she would tell his second wife. A. left the next morning without saying why she was leaving because she did not think she would be believed.

*The Defense*

Fuson testified in his own defense. He explained that he and his second wife had discussed the sexual education of their children and that he believed, along with certain experts in the field of sex education, that a parent should take an active role in the teaching of sexual matters versus his wife's attitude of leaving the matters to the schools. Fuson then admitted involving himself in his daughters' sexual education even when they were young, including A., but denied he ever physically touched them with his hand or any other object, engaged in intercourse or oral copulation, or exposed himself to them. He also instructed the girls on the use of feminine hygiene products and had helped R. retrieve a tampon she had inserted incorrectly one time.

Regarding the living room incident with R.L. that R. testified she witnessed, Fuson claimed he had been putting a hot compress on R .L. after she complained of a sore shoulder. He explained that the vibrator exhibited in court was found in R.M.'s underwear drawer, that he merely discussed its functioning with her, and that he never touched any of his daughters with it. Fuson conceded he had discussed the topic of "rubbers"

with R.L., but only after she asked questions about what they were.

Fuson stated he had been stunned when the police asked him about the sexual allegations. He explained that in his interview with them, he actually had meant to say he taught his daughters about masturbation, not how to masturbate; and that he had only touched his daughters' genitals when he had bathed them as young children. He claimed his statements regarding going beyond the law were made "under duress" in an attempt to mislead the investigation, and to deflect attention away from his daughters and toward him.

Fuson's brother and several friends also testified in the defense case. His brother testified about two incidents when R.M. had allegedly threatened to accuse him of misconduct toward her. The friends testified Fuson was a very honest person who had a reputation for honesty in the community.

(Lodgment 2 at 3-9 (footnote omitted).)

Additionally, the appellate court provided the following factual background with regard to Petitioner's statements to police:

In response to Fuson's in limine motion to suppress his statements made to Chula Vista police sergeant John McAvenia and detective Ruth Hinzman, the trial court conducted an evidentiary hearing.

McAvenia testified that on October 23, 2001, he received a telephone call from CPS regarding allegations that Fuson had been molesting two of his daughters. The two daughters were brought into the police station to be separately interviewed by Hinzman. Afterwards, Hinzman discussed with him some of the allegations of sexual molest made by those daughters, her tendency to believe the girls, and how to get Fuson out of the home so other detectives could talk with a third daughter who was home after foot surgery to determine whether she was also being victimized. When the other detectives were sent to the residence, McAvenia made a "pretextual call to Mr. Fuson, saying there'd been an altercation at school with one of his daughters and that she specifically asked for him to come to the police station and talk about it."

McAvenia was notified by radio by other detectives sent to observe when Fuson had "in fact" left the home to come the four and a half blocks to the police station. Those detectives, in civilian clothing and unmarked cars, were sent to the area of the home to make sure the interviewing detectives could have access to the other daughter and to see if Fuson were nervous or "made a run for it." McAvenia said the matter was "still in the investigative stage and we didn't know exactly what we had...." The detectives reported back to McAvenia when Fuson actually was coming in the front door of the lobby area of the police station.

Because the other interview rooms were being used, McAvenia determined he would talk to Fuson in his "little" office outside the family protection unit and secreted "a micro cassette recorder in [a] box of reports" and started it before going to the front counter and introducing himself to Fuson, who had been told to ask for "Mr. Mac." After shaking Fuson's hand, McAvenia told him that they "needed to talk about something involving his daughter." When Fuson expressed concern about her welfare, McAvenia said, "She's fine. We need to go talk in private." He then walked Fuson back to his office through a hallway that "goes kind of between offices...."

McAvenia explained that "when you come in the door [to my office] there's a little table to the right that's got a coffee maker and a

refrigerator on it. To the left is immediately my desk and behind me is a couple of file cabinets, maybe eight feet wide, 12 feet long. It's a pretty small office." A person sitting across the desk from McAvenia would "be in the doorway." There are two chairs other than his in the office. When McAvenia arrived at his office with Fuson, McAvenia sat behind his desk and Fuson sat on a chair on the opposite side closest to the door, which McAvenia had Fuson close. The door locked people out, not in.

The interview, which produced two audiotapes, lasted approximately one and one-half hours. After the first "five to 10 minutes" Hinzman, who was wearing "casual but business attire," arrived and took part in the interview. Hinzman sat in the chair closest to the door and Fuson moved to the other chair across from McAvenia. McAvenia conceded that Hinzman sitting in that chair would have blocked Fuson's direct access to the door. Neither McAvenia or Hinzman were wearing guns or badges at the time.

Before Hinzman arrived, McAvenia had basically told Fuson why he was there, saying he was not arrested, but that there had been some sexual allegations made against him. Fuson said he had "experienced this before and wasn't going to say anything without a lawyer." The conversation continued. Although McAvenia had not advised Fuson formally of his rights against self-incrimination before talking with Fuson in the office, McAvenia thought all the points of Miranda had been "eventually covered." Both he and Fuson brought up the issue of an attorney on several other occasions. When Hinzman joined them, McAvenia briefed her on what had happened in the conversation before her arrival, including telling her he had told Fuson he did not have to talk without a lawyer and that they could "get him one." Hinzman then explained again to Fuson that "the court will ... appoint you an attorney," and Fuson said he understood, but was scared. Although the conversation then continued, McAvenia believed the attorney issue had pretty much been resolved earlier when Fuson had said, "Go ahead and interview."

Hinzman then testified at the evidentiary hearing, confirming McAvenia's testimony concerning the events before Fuson's interview which began without her. McAvenia briefed her on what he and Fuson were talking about as soon as she arrived. Hinzman believed she knocked to enter McAvenia's office which locks from the major office to McAvenia's office; "but once you're inside, it doesn't lock. You can just open it." She did not know who opened it because McAvenia was in the chair behind the desk and Fuson was sitting in the chair closest to the wall and "closest to the door, if you're making an exit route." Hinzman said the room also had windows to the main office, where you could see nonuniformed civilian and law enforcement personnel working at their desks, but not to the outside.

During the interview with Fuson, Hinzman did not become aware of the results of the third daughter's interview. Although Hinzman remembered some talk about an attorney, she did not recall whether anybody left the room during the interview. Fuson was formally arrested at the conclusion of the interview. At no time earlier had she told Fuson he was under arrest. Hinzman described the interview scene as "just sitting there, talking." She never told Fuson he could not leave. Rather she had told him just the opposite. Up until the end of the interview Fuson could have left the police station unarrested. It was not until that time that Hinzman thought "Fuson had corroborated enough of what the two younger daughters said, [that she] didn't feel it was safe for the daughters for him to go home and be with them."

The two tapes of the interview with Fuson, along with their written

1    transcripts, were then entered into evidence for the court to consider for
     the motion.

2        After considering the testimony of McAvenia and Hinzman,
     listening to the tapes of the interview, and considering counsel's

3    arguments, the court ruled it was not persuaded by a preponderance of the
     evidence that under the totality of the circumstances, a reasonable person

4    in Fuson's circumstances would have concluded he was in custody or its
     functional equivalent. The court clarified that it was finding, "based on

5    the totality of the circumstances, in applying the objective standard of
     reasonableness, that this was not a custodial interrogation or the

6    functional equivalent of a custodial interrogation. And therefore, the
     necessity for any admonition had not attached."

7    (Id. at 11-15 (footnote omitted).)

8                                    **Analysis**

9        Petitioner asserts five grounds for relief in his federal petition: (1) the police

10   failed to give Miranda warnings before custodial interrogation and violated his Fifth

11   Amendment right against self incrimination; (2) the police failed to honor his request

12   for counsel in violation of the Fifth Amendment right to counsel; (3) the trial court's

13   decision to allow a child witness to testify with her hand covering a portion of her face

14   violated Petitioner's Sixth Amendment right to confrontation and his Fourteenth

15   Amendment right to due process; (4) his sentence violated the Eighth Amendment

16   prohibition against cruel and unusual punishment; and (5) upper and consecutive terms

17   imposed without factual findings by the jury violated Petitioner's Sixth Amendment

18   right to a jury trial.

19   **A.    Standards of Review**

20           **1.    Review of Magistrate Judge's Report and Recommendation**

21       The district court "may accept, reject, or modify, in whole or in part, the findings

22   or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party objects

23   to any portion of the report, the district court "shall make a *de novo* determination of

24   those portions of the report . . . to which objection is made." Id. The Court reviews de

25   novo the magistrate judge's conclusions of law. Britt v. Simi Valley Unified School

26   Dist., 708 F.2d 452, 454 (9th Cir. 1983) overruled on other grounds by United States

27   v. Reyna-Tapia, 328 F.3d 1114, 1121-22 (9th Cir. 2003).

28   / / /

**2.     Scope of Review of 28 U.S.C. § 2254 Petition**

Title 28, United States Code, § 2254(a) sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State Court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a) (West Supp. 2003).

This action is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under 28 U.S.C. § 2254(d), as amended by the AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision may be found "contrary to" clearly established Supreme Court precedent: "(1) if the state court applies a rule that contradicts the governing law set of forth in [the Court's] cases or (2) if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state-court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407. Alternatively, an unreasonable application may be found "if the state court either unreasonably extends a legal principle from [Supreme

Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly . . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to dicta, of [the United States Supreme] Court's decisions." Williams, 529 U.S. at 412. A state court need not cite to Supreme Court precedent in ruling on a habeas corpus petition. Early v. Packer, 537 U.S. 3, 8 (2002). Indeed, the state court need not even be aware "of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Id.

Finally, where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Lockyear, 538 U.S. at 75-76); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

**B.     Discussion**

> **1.     The Police Officers Did Not Violate Petitioner's Fifth Amendment Right Against Self Incrimination Because He Was Not in Custody at the Time of His Interview**

Petitioner argues that the trial court should have granted his motion to suppress his statements to police because officers violated his Fifth Amendment right against self incrimination when they conducted a custodial interrogation without advising him of his Miranda rights. Officers told Petitioner from the outset of the interview that he

was not under arrest, he was in control of the discussion and the questions he answered, and he could terminate the conversation and leave.  While the police officers initially invited Petitioner to the police station based on a ruse regarding one of Petitioner's daughters being in an altercation at school, the officers told Petitioner soon after his arrival at the station that although he was not under arrest, they wanted to discuss allegations of sexual misconduct made against Petitioner.  Based on these facts, Respondent asserts that a reasonable person would not have thought he was in custody.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  Under the guidelines first set out in Miranda v. Arizona, before conducting interrogation of a person in custody, police must give pre-interrogation warnings.  384 U.S. 436, 444 (1966).  "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  Id.

The existence of custody is determined using an objective test.  Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  The ultimate inquiry into whether custody has attached is "simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  Miranda warnings are not required simply because the questioning takes place at a police station or because the questioned person is the one whom the police suspect.  Id.  Instead, the court must evaluate all of the circumstances surrounding the questioning and determine whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  Thompson v. Keohane, 516 U.S. 99, 112 (1995).

Once a suspect is in custody and has invoked the right to silence or the right to an attorney, the invocation must be scrupulously honored.  Miranda, 384 U.S. at 478-79.  Miranda rights do not vest until a suspect is in custody, however, and the

Supreme Court has never held that a person can invoke the rights anticipatorily. McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991) ("We have never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'"); United States v. Hines, 963 F.2d 255, 256 (9th Cir. 1992) ("[T]he Fifth Amendment right to counsel under *Miranda* does not vest until a defendant is taken into custody. Therefore, if [the defendant] was not in custody during the first interview, the reference to his lawyer at that time cannot be considered an invocation of *Miranda* rights." (citations omitted)).

In Oregon v. Mathiason, the defendant, responding to a card left at his door, called police and agreed to meet with an officer at the police station. 429 U.S. 492, 493. When the defendant arrived, he was met by an officer, taken into an office, and interviewed with the door closed. Id. The officer informed the defendant that he was not under arrest, but that police suspected he was involved in a burglary. Id. The officer then falsely told the defendant that his fingerprints were found at the scene of the crime. Id. Within five minutes of coming to the office, the defendant confessed, and the officers allowed him to leave about thirty minutes after questioning began. Id. at 493-94. The Supreme Court held that the defendant was not in custody during the interview as he had arrived voluntarily, was immediately told he was not under arrest, and left the station after the interview. Id. at 495; see also California v. Beheler, 463 U.S. 1121, 1125 (1983) (holding no Miranda warnings required where defendant came to police station voluntarily, was told he was not under arrest, and left following the interview). The Court explained that Miranda warnings are not required simply because questioning takes place at the station house or because the questioned person is a suspect. Mathiason, 429 U.S. at 495. As the Court explained:

> [A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged

1    with a crime.

2    Id.   The Court also stated that the false statement by police about finding the

3    defendant's fingerprints had no bearing on the custody determination.  Id. at 495-96.

4        In Yarborough v. Alvarado, the Supreme Court again analyzed whether a

5    defendant was in custody.  541 U.S. 652 (2004).  At the relevant time period, the

6    defendant was seventeen years old.  Id. at 656.  Police left messages at the defendant's

7    house and with his mother that they wished to speak with him.  Id.  Subsequently, the

8    defendant's parents brought him to the police station, the police interviewed him for

9    about two hours in a small interview room before allowing him to leave, and the police

10   secretly recorded the conversation.  Id.

11       The Court concluded in Yarborough that the state court's ruling that the

12   defendant was not in custody was a reasonable application of clearly established

13   Supreme Court law.  Noting that "fairminded jurists could disagree" over the custody

14   issue, the Court determined that the state court's finding of no custody was eminently

15   reasonable.  Id. at 664-65.  According to the Court, several facts weighed against a

16   finding of custody: (1) the police did not transport the defendant to the station; (2) the

17   police did not threaten or suggest that he would be placed under arrest; (3) instead of

18   threatening arrest, the interviewing officer appealed to the defendant's interest in

19   telling the truth and being helpful to the officer; (4) the officer asked the defendant if

20   he wanted to take a break; and (5) the defendant went home at the end of the interview.

21   Id. at 664.  According to the Court, other facts weighed in favor of custody: (1) the

22   officer interviewed the defendant at the police station; (2) the interview lasted two

23   hours, longer than the 30 minute interview in Mathiason; (3) the officer did not tell the

24   defendant that he was free to leave; and (4) instead of arriving of his own accord, the

25   defendant's parents brought him to the station, making his control over his presence

26   at the station unclear.  Id. at 665.  In total, given the circumstances on both sides of the

27   custody determination, and given that the custody test is general, the Court ruled that

28   the state court's application fit within the matrix of the Court's prior decisions.  Id.

Similar to <u>Yarborough</u>, the state appellate court's holding that, based on the totality of the circumstances, Petitioner was not in custody for Fifth Amendment purposes is not contrary to, or an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court.  Although police indicated that one of his daughters had been involved in an altercation to get Petitioner out of the house so that they could speak to another daughter, Petitioner came to the police station voluntarily and was not transported by police, just like the defendant in <u>Yarborough</u>. (<u>See</u> RT, Vol. 5 at 402-03, 429-30; Vol. 6 at 562-64.)  Once at the station, plainclothes police officers without badges or guns interviewed Petitioner.  Rather than conducting the interview in an interrogation room, Petitioner was interviewed in a private office containing windows, a desk, chairs, and a table with a coffee maker and refrigerator. Additionally, until another officer joined the interview and sat near the door, Petitioner sat next to a door that was unlocked from the inside.  Thus, the interview conditions were less intimidating or "coercive" than those in <u>Mathiason</u>.

Further, unlike in <u>Yarborough</u>, the interviewing officer began the interview by telling Petitioner that he was not under arrest: "So right now you're not under arrest or anything but someone's thinking you might be doin' some sexual touching with your kids."  (Lodgment 1, Augment Clerk's Transcript ("ACT") at 56 (transcript of interview).)  Moreover, throughout the interview, the officers told Petitioner that he did not need to talk, he was free to leave, he did not have to answer any questions he did not want to answer, and he could have an attorney present.  The interview proceeded for about ninety minutes, but the detectives maintained a casual tone throughout the interview and refrained from making threats, similar to the detectives in <u>Yarborough</u>. Additionally, although the officers indicated that Petitioner was the subject of an investigation into "pretty serious allegations" and that charges may be filed, the Supreme Court has held that informing a defendant that he is a suspect is insufficient to establish custody.  <u>See</u> <u>Mathiason</u>, 429 U.S. at 493, 495 (informing defendant that he was a suspect and falsely stating that his fingerprints were found at the scene

1  insufficient to find custody).

2      In sum, given the circumstances surrounding Petitioner's interview, a reasonable

3  person would not have thought he was in custody.   Further, the state court's

4  determination was within the matrix of the Supreme Court's decisions.  Yarborough,

5  541 U.S. at 665. Therefore, the state court's decision that Petitioner was not in custody

6  was not an unreasonable application of clearly established Supreme Court law.

7      **2.**    **Police Officers Did Not Violate Petitioner's Fifth Amendment Right**

8      **to Counsel Because Any Requests for Counsel Occurred Before He**

9      **Was in Custody and Were Ineffective**

10      Petitioner claims that his Fifth Amendment right to counsel was violated when,

11  after he was confronted with serious allegations of sexual misconduct, he was not

12  provided a lawyer despite indications that he desired a lawyer before speaking.

13  Respondent claims that Petitioner's requests for counsel were ineffective because he

14  was not in custody at the time of the requests and, therefore, could not invoke his

15  Miranda rights anticipatorily.

16      The United States Supreme Court has "never held that a person can invoke his

17  *Miranda* rights anticipatorily, in a context other than custodial interrogation." McNeil,

18  501 U.S. at 182 n.3.  As the Ninth Circuit has explained, "the Fifth Amendment right

19  to counsel under *Miranda* does not vest until a defendant is taken into custody.

20  Therefore, if [the defendant] was not in custody during the first interview, the reference

21  to his lawyer at that time cannot be considered an invocation of *Miranda* rights."

22  Hines, 963 F.2d at 256 (citations omitted). Therefore, because Petitioner was not in

23  custody during his police interview, the state appellate court's determination that

24  Petitioner's Fifth Amendment right to counsel was not violated is not contrary to, or

25  an unreasonable application of, clearly established federal law as set forth by the

26  Supreme Court.

27  / / /

28  / / /

- 15 -

1    **3.    The Trial Court Did Not Violate Petitioner's Sixth Amendment**
2    **Confrontation Rights or Fourteenth Amendment Due Process Rights**
3    **When His Twelve Year Old Daughter Testified While Shielding the**
4    **Side of Her Face with Her Hand**

5    Next, Petitioner asserts that the trial court violated his Sixth Amendment right
6    to confront the witnesses against him and his Fourteenth Amendment right to a fair trial
7    when it denied his request that R.L., Petitioner's twelve year old daughter, remove her
8    hand from her face while testifying.  In opposition, Respondent argues that there is no
9    absolute right to a face to face meeting with witnesses.  Further, because no physical
10   barrier or technological device was used to insulate R.L. from the view of Petitioner,
11   he was able to view her general demeanor.  Respondent also claims that R.L. was
12   subject to cross-examination and that the jury was able to view both Petitioner and R.L.
13   and see both their reactions during her testimony.

14   The Confrontation Clause of the Sixth Amendment provides that an individual
15   accused of a crime has the right to confront the witnesses against him.  U.S. Const.
16   amend. VI; Maryland v. Craig, 497 U.S. 836, 844-45 (1990).  The Confrontation
17   Clause "ensure[s] the reliability of the evidence against a criminal defendant by
18   subjecting it to rigorous testing in the context of an adversary proceeding before the
19   trier of fact."  Craig, 497 U.S. at 845.  As the Supreme Court stated in Craig:

20       "The primary object of the [Confrontation Clause] was to prevent
         depositions or ex parte affidavits, such as were sometimes admitted in
21       civil cases, being used against the prisoner in lieu of a personal
         examination and cross-examination of the witness in which the accused
22       has an opportunity, not only of testing the recollection and sifting the
         conscience of the witness, but of compelling him to stand face to face
23       with the jury in order that they may look at him, and judge by his
         demeanor upon the stand and the manner in which he gives his testimony
24       whether he is worthy of belief."

25   Id. (quoting Mattox v. U.S., 156 U.S. 237, 242-43 (1895)).

26   In line with the Confrontation Clause's purposes, the right to face to face
27   confrontation is not absolute, and the Supreme Court has recognized exceptions.  Id.
28   at 844.  In Craig, for example, the Supreme Court held that a statute permitting child

witnesses to testify from a separate room using closed-circuit television did not violate the Sixth Amendment right to confront witnesses because the trial court made individualized findings that each of the child witnesses needed special protection.  Id. at 844, 857.  Noting that it had long rejected a literal reading of the Confrontation Clause, the Court stated that the "'Confrontation Clause reflects a preference for face-to-face confrontation at trial,' a preference that 'must occasionally give way to considerations of public policy and the necessities of the case.'"  Id. at 849 (citations omitted).  With regard to child abuse victims, the Court "concluded . . . that a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court."  Id. at 853.  The Court explained that, although the use of closed-circuit television prevented the witness from seeing the accused, it preserved all the other elements of the right to confrontation:

> Maryland's procedure preserves all of the other elements of the confrontation right: The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies.

Id. at 851.

In contrast, in Coy v. Iowa, the Supreme Court determined that use of a physical barrier, a screen, to hide testifying children from the defendant violated the defendant's right to face to face confrontation.  487 U.S. 1012, 1014-15 (1988).  The Craig court noted that the court in Coy had not made any findings that the witnesses needed special protection.  Craig, 497 U.S. at 845.

In the present case, the state appellate court's holding that Petitioner's right to confront witnesses was not violated is not contrary to, or an unreasonable application of, clearly established law as determined by the Supreme Court.  All the elements of the right of confrontation present in Craig were also present here, and, additionally, R.L. was physically present in the courtroom.  R.L. was competent to testify and did testify under oath.  Petitioner had the full opportunity to conduct cross examination,

1   and he did so, where he could test the recollection and truthfulness of R.L.  Further, the

2   judge, jury, and Petitioner were all able to view the demeanor of R.L. as she testified.

3        Moreover, the present case is readily distinguishable from Coy.  Here, the court

4   did not erect a physical barrier to block R.L.'s view.  She was forced to sit in open

5   court in a position where she could see Petitioner.  Although R.L. chose to shield her

6   face from Petitioner, this action was part of her demeanor and within full view of the

7   jury, which could then draw any necessary inferences from her conduct.  As the

8   Supreme Court has stated, "[t]he Confrontation Clause does not, of course, compel the

9   witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the

10  trier of fact will draw its own conclusions."  Coy, 487 U.S. at 1019.  It would not be

11  possible for the jury to draw such inferences with the use of a large screen, as in Coy,

12  because the witness' view of the accused would be blocked without any action on the

13  part of the witness that the jury could consider as part of her demeanor.  Finally, in this

14  case no electronic devices or physical barriers separated Petitioner from R.L., and the

15  record contained evidence of concern, including by Petitioner, for R.L.'s well being

16  and ability to testify in front of her father in an open courtroom.  (See, e.g., Lodgment

17  2 at 39.)  In sum, the state court's conclusion that Petitioner's confrontation rights were

18  not violated was not an unreasonable application of clearly established Supreme Court

19  precedent.

20       Moreover, the state court's resolution of Petitioner's due process claim was not

21  an unreasonable application of controlling Supreme Court precedent.  "As applied to

22  a criminal trial, denial of due process is the failure to observe that fundamental fairness

23  essential to the very concept of justice."  Lisenba v. California, 314 U.S. 219, 236-37

24  (1941).   Contrary to Petitioner's argument that the jury would obviously draw

25  pejorative inferences from R.L.'s use of her hand while testifying, as the state court

26  observed, her actions while testifying could be interpreted by the jury in any number

27  of ways.  For example, R.L.'s conduct could indicate untruthfulness, embarrassment,

28  evasiveness, or other various emotional or cognitive states.  Accordingly, it is entirely

speculative to conclude that the jury would have inferred from R.L.'s use of her hand that Petitioner was guilty.   In short, the state court's conclusion was not an unreasonable application of clearly established federal law.

Finally, the remainder of the record included testimony from other child victims, testimony from Petitioner's oldest daughter, the tapes of R.L.'s earlier interviews, and Petitioner's own statements and testimony, which together combine to establish Petitioner's guilt.  Accordingly, any error would have been harmless.  See Brecht v. Abrahamson, 507 U.S.

### 4.   Petitioner's Sentence Does Not Violate the Eighth Amendment Prohibition Against Cruel and Unusual Punishment

Next, Petitioner claims that his sentence is cruel and unusual punishment in violation of the Eighth Amendment.  He argues that the sentence is improper because the aggregate time is grossly disproportionate to the severity of his offenses. According to Petitioner, his sentence far exceeds the amount of time he would have received had he been convicted of murder.

Respondent argues that Petitioner's sentence is not cruel or unusual because he committed multiple sex offenses against multiple victims on multiple occasions. Respondent further contends that sexual acts upon minors are particularly repugnant, can have long-lasting effects, and are especially heinous because Petitioner committed the crimes against his own daughters.

As the Supreme Court has recently noted, only "one governing legal principle emerges as 'clearly established' under § 2254(d)(1): A gross disproportionality principle is applicable to sentences for terms of years." Lockyer v. Andrade, 538 U.S. 63, 72 (2003).  As to application of the gross disproportionality principle, "the precise contours . . . are unclear," but the principle is "applicable only in the 'exceedingly rare' and 'extreme' case." Id. at 73.

In previous cases, the Supreme Court has upheld lengthy sentences for crimes less severe than that involved in this case.  In Harmelin v. Michigan, for example,

while the case did yield a majority opinion regarding the contours of any proportionality principles, the Court ruled that a life sentence without the possibility of parole for the possession of 672 grams of cocaine was not cruel and unusual. 501 U.S 957, 961, 996 (1991). As Justice Kennedy observed, "the relative lack of objective standards concerning terms of imprisonment has meant that [o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [are] exceedingly rare." Id. at 1001 (Kennedy, J., concurring) (internal quotations and citations omitted). Similarly, in Rummell v. Estelle, the Court refused habeas relief to a petitioner serving a life sentence for the commission of three felonies over the course of nine years. 445 U.S. 263, 265-66 (1980). The three convictions were for fraudulently using a credit card to obtain $80 worth of goods or services, passing a forged check in the amount of $28.36, and obtaining $120.75 by false pretenses. Id.; see also Hutto v. Davis, 454 U.S. 370, 370-74 (rejecting Eighth Amendment challenge to forty year sentence for possession and distribution of less than nine ounces of marijuana).

Based on the Supreme Court's decisions, the state appellate court's holding that Petitioner's sentence was not cruel and unusual is not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. The magnitude of Petitioner's sexual offenses against his own daughters is greater than the offenses committed in Harmelin, Rummell, and Hutto. Further, Petitioner committed repeated sexual offenses over a long period of time, as did the defendant in Rummell, yet Petitioner's sentence is less severe than the sentence at issue in that case. In sum, Petitioner has not shown that his sentence is so grossly disproportionate to his sexual offenses that it is one of the "'exceedingly rare' and 'extreme' cases" in which the sentence imposed violates the Eighth Amendment. See Andrade, 538 U.S. at 73.

> 5.    **Petitioner's Sixth Amendment Right to a Jury Trial Was Not Violated by the Imposition of Consecutive and Upper Terms**

Petitioner claims that the trial court denied him his Sixth Amendment right to a

jury trial in two respects.  First, he argues that the court violated his right to a jury trial when it sentenced him to the upper terms on certain counts based on aggravating factors never submitted to a jury.  Second, he contends that the trial court violated his Sixth Amendment rights when it imposed consecutive sentences based on an implied finding of a sentencing factor never submitted to a jury.

Respondent contends that the imposition of upper terms did not violate Petitioner's right to a jury trial because California Rules of Court, rule 4.421(a)(7) authorizes the imposition of upper terms when the defendant is sentenced to concurrent terms for other crimes where consecutive sentencing was available.  Respondent argues that the imposition of consecutive sentences does not violate Petitioner's right to a jury trial because the verdict reflected findings that the crimes were committed against separate victims at different times and in different places.  Respondent claims that this is sufficient reason to impose consecutive terms as no additional fact-finding by the jury is required.  Respondent further asserts that neither the U.S. Supreme Court, nor any other court, has ever held that imposing consecutive terms is subject to the constitutional limitations set forth in Blakely v. Washington, 542 U.S. 296 (2004).

> **a.    Imposition of the Upper Terms Did Not Violate Petitioner's Sixth Amendment Right to a Jury Trial**

Petitioner was sentenced under California's determinate sentencing law and the rules governing its application.  Under California's sentencing law as it existed when Petitioner was sentenced, a sentencing court began with the middle term and moved from that term only when it found, and placed on the record, aggravating or mitigating facts related to the offense or the offender beyond the elements of the charged offense. Cunningham v. California, 127 S. Ct. 856, 863 (2007); People v. Black, 41 Cal. 4th 799, 808 (2007).  California's sentencing law permitted the court to rely on aggravating facts not found by the jury in imposing the upper term.[3]  See Black, 41 Cal. 4th at 808.

_____

[3] In response to Cunningham v. California, the California Legislature amended California's sentencing law, effective March 30, 2007.

1    In <u>Cunningham v. California</u>, however, the United States Supreme Court held
2  that California's sentencing law violated a defendant's constitutional right to a jury trial
3  by assigning to the trial judge, rather than the jury, the authority to find facts permitting
4  an upper term sentence.  127 S. Ct. 856.  According to the Court, "under the Sixth
5  Amendment, any fact that exposes a defendant to a greater potential sentence must be
6  found by a jury, not a judge, and established beyond a reasonable doubt, not merely by
7  a preponderance of the evidence." <u>Id.</u> at 863-64.  In <u>Cunningham</u>, the Court concluded
8  that the middle term was the relevant statutory maximum.  <u>Id.</u> at 868.

9                    **1.     Cunningham Does not Apply Retroactively**

10    The Court first notes that it may not consider <u>Cunningham</u> in deciding whether
11  the state court's sentencing of Petitioner to upper term sentences on certain counts was
12  contrary to, or an unreasonable application of, clearly established Supreme Court law.
13  In <u>Teague v. Lane</u>, 489 U.S. 288 (1989), the Supreme Court held that a new procedural
14  rule of constitutional law cannot be applied retroactively on federal collateral review
15  to upset a state conviction or sentence unless (1) the new rule forbids criminal
16  punishment of "primary, private individual" conduct or (2) is a "watershed" rule of
17  criminal procedure.  <u>See</u> <u>Teague</u> at 311; <u>see also</u> <u>Caspari v. Bohlen</u>, 510 U.S. 383, 396
18  (1994).  If a rule is procedural, the habeas court must conduct a three step analysis to
19  determine if <u>Teague</u> bars the claim at issue.  <u>See</u> <u>Caspari</u>, 510 U.S. at 396.  First, a court
20  must determine when the defendant's conviction became final; second, it must
21  ascertain the legal landscape as it then existed, and ask whether the Constitution, as
22  interpreted by the precedent then existing, compelled the rule, to determine whether the
23  rule is actually "new;" and third, if the rule is new, the court must consider whether it
24  falls within either of the two <u>Teague</u> exceptions to nonretroactivity.  <u>See</u> <u>Beard v.
25  Banks</u>, 542 U.S. 406, 411 (2004).  <u>Teague's</u> nonretroactivity principle acts as a
26  limitation on the power of federal courts to grant habeas corpus relief to state prisoners.
27  <u>See</u> <u>id.</u> at 412.

28    A state conviction becomes "final," for purposes of Teague's rule of

nonretroactivity of new decisions of constitutional criminal procedure on habeas review, when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.  See id.; see also Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir.1999).  Therefore, Petitioner's conviction became final no later than June 15, 2005.  Because Petitioner's conviction became final before Cunningham was decided on January 22, 2007, Cunningham is not applicable to Petitioner's sentence unless Cunningham's rule that California's sentencing law violated the Sixth Amendment was not a new rule or one of the two narrow retroactivity exceptions applies.

The Court concludes that Cunningham did announce a new constitutional rule. The California Supreme Court and three justices of the United States Supreme Court did not believe that previous Supreme Court Sixth Amendment cases applied to California's sentencing law. See Cunningham, 127 S. Ct. at 872 (Kennedy, J., & Alito, J., dissenting); People v. Black, 35 Cal. 4th 1238, 1255-64 (2005).  In light of this authority on the opposite side of the Cunningham court, it cannot be said that the result in Cunningham was compelled by previous Sixth Amendment precedent. See Whorton v. Bockington, 127 S. Ct. 1173, 1181 (2007) (concluding that if "reasonable jurists" could have concluded that prior precedent did not dictate a rule, it is a new rule).

The Court also concludes that Cunningham does not meet either of the narrow Teague exceptions that would allow it to be applied retroactively.  The Ninth Circuit has held that Blakely does not apply retroactively to convictions that became final prior to its final publication because Blakely did not announce a watershed rule of criminal procedure.   See Schardt v. Payne, 414 F.3d 1025, 1036 (9th Cir. 2005). Since Cunningham is similar to, and relied heavily on, Blakely, Cunningham similarly did not announce a watershed rule.  Neither does Cunningham implicate "private" conduct. Therefore, the Court concludes that, pursuant to the Teague test, Cunningham does not apply retroactively.

/ / /

**2.    Sentencing Petitioner to Upper Term Did Not Violate the Sixth Amendment**

Prior to <u>Cunningham</u>, however, in <u>Apprendi v. New Jersey</u>, the Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). As the Court clarified in <u>Blakely</u>, the statutory maximum for purposes of the Sixth Amendment right to a jury trial is not necessarily the maximum penalty stated in a statute, but "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." 542 U.S. at 303. The constitutional requirement of a jury trial applies to facts that are "legally essential to the punishment." <u>Id.</u> at 313. In other words, a defendant has the right to a jury trial as to "any fact that exposes a defendant to a greater potential sentence" than that authorized by the jury verdict alone. <u>Cunningham</u>, 127 S. Ct. at 863. "The Sixth Amendment question . . . is whether the law forbids a judge to increase a defendant's sentence unless the judge finds facts that the jury did not find (and the offender did not concede)." <u>Rita v. United States</u>, 127 S. Ct 2456, 2466 (2007).

Having established the statutory maximum, selecting a sentence within that statutory sentencing range does not implicate the Sixth Amendment. As the United States Supreme Court has explained, "judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments." <u>Harris v. United States</u>, 536 U.S. 545, 558 (2002). Facts considered by trial courts in exercising their discretion within the statutory range of punishment authorized for a crime "have been the traditional domain of judges; they have not been alleged in the indictment or proved beyond a reasonable doubt. There is no reason to believe that those who framed the Fifth and Sixth Amendments would have thought of them as the elements of the crime." <u>Id.</u> at 560. Thus, the "Sixth Amendment cases do not automatically forbid a

sentencing court to take account of factual matters not determined by a jury and to increase the sentence in consequence."  Rita v. United States, 127 S. Ct. 2456, 2465-66 (2007).

The California Supreme Court has recently reiterated that, under California's sentencing law, "the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term."  Black, 41 Cal. 4th at 813 (citing People v. Osband, 13 Cal. 4th 622 (1996)).  Therefore, if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in Blakely, the defendant is not "legally entitled" to the middle term sentence, and the upper term sentence is the "statutory maximum."  In Black, the California Supreme Court analyzed whether the upper term was the relevant statutory maximum under California's sentencing law in light of Apprendi, Blakely, and Cunningham:

> [S]o long as a defendant is *eligible* for the upper term by virtue of facts that have been established consistently with Sixth Amendment principles, the federal Constitution permits the trial court to rely upon any number of aggravating circumstances in exercising its discretion to select the appropriate term by balancing aggravating and mitigating circumstances, regardless of whether the facts underlying those circumstances have been found to be true by a jury.

Black, 41 Cal. 4th at 813.  Thus, the Black court concluded that, because the jury had found  use of force, the sentencing did not violate the defendant's Sixth Amendment right to a jury trial.  Id. at 816.

Addressing sentencing schemes similar to California's determinate sentencing law, the supreme courts of Arizona and Colorado have reached the same conclusion. State v. Martinez, 210 Ariz. 578 (2005), cert. denied, 546 U.S. 1044 (2005) (if a jury finds or the defendant admits a single aggravating factor, the sentencing judge may consider additional factors relevant to the imposition of sentence); Lopez v. People, 113 P.3d 713 (Colo. 2005), cert. denied, 546 U.S. 1017 (2005) (one constitutionally complying aggravating circumstance is sufficient to support an aggravated sentence even if the sentencing judge considered other circumstances.)

Here, as in Black, Petitioner was eligible for the upper term without any

additional factual findings by the trial court.  Rule 4.421(a) of the California Rules of Court lists aggravating factors that may enhance a sentence, including that the "defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed."  Cal. Rules of Court 4.421(a)(7).  Petitioner was sentenced concurrently on fourteen counts where consecutive sentences could have been imposed.  This single aggravating factor allowed for imposition of upper terms on the remaining counts.  See Black, 41 Cal. 4th at 813 (citing People v. Osband, 13 Cal. 4th 622 (1996)).  Accordingly, without any findings of fact by the trial court, Petitioner was eligible for sentencing in the upper term, and that was the relevant statutory maximum for Sixth Amendment purposes.  Because the Petitioner was eligible for the upper term absent any factfinding by the court, any facts upon which the trial court relied in selecting the particular sentence "d[id] not pertain to whether the defendant ha[d] a legal right to a lesser sentence-and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned."  Blakely, 542 U.S. at 309.  No additional fact finding by the jury was required to make this determination, unlike the finding of racial bias in Apprendi or the finding of deliberate cruelty in Blakely.  Accordingly, the state court's determination that Petitioner's upper term sentence as to six counts did not violate the Sixth Amendment was not an unreasonable application of controlling Supreme Court law.

> **b.**    **Imposition of Consecutive Sentences Did Not Violate Petitioner's Sixth Amendment Right to a Jury Trial**

The state court's decision that imposition of consecutive sentences did not violate Petitioner's Sixth Amendment right to a jury trial was not an unreasonable application of clearly established federal law as determined by the Supreme Court.  Both Blakely and Apprendi only dealt with "increas[ing] the penalty for a crime beyond the prescribed statutory maximum," not with the imposition of consecutive terms.  Blakely, 542 U.S. at 301; Apprendi, 530 U.S. at 476.  Further, Petitioner has not

cited, and the Court has not located, any Supreme Court precedent indicating that imposition of consecutive terms implicated Petitioner's Sixth Amendment rights under these circumstances.  Indeed, the <u>Apprendi</u> court specifically declined to address consecutive sentencing and focused on the imposition of an enhanced sentence on one particular count stating:

> It is appropriate to begin by explaining why certain aspects of the case are not relevant to the narrow issue that we must resolve. First, the State has argued that even without the trial judge's finding of racial bias, the judge could have imposed consecutive sentences on counts 3 and 18 that would have produced the 12-year term of imprisonment that Apprendi received; Apprendi's actual sentence was thus within the range authorized by statute for the three offenses to which he pleaded guilty. The constitutional question, however, is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum for the offense charged in that count. The finding is legally significant because it increased--indeed, it doubled--the maximum range within which the judge could exercise his discretion, converting what otherwise was a maximum 10-year sentence on that count into a minimum sentence. The sentences on counts 3 and 22 have no more relevance to our disposition than the dismissal of the remaining 18 counts.

<u>Apprendi</u>, 530 U.S. at 474.

Further, subsequent to the decisions in <u>Blakely</u> and <u>Apprendi</u>, the high courts of several states, including California, have held that imposition of consecutive sentences does not violate a defendant's Sixth Amendment right to jury trial, at least where the sentencing scheme does not require the court to make factual findings before imposing consecutive terms.  <u>See</u> <u>People v. Black</u>, 41 Cal. 4th 799, 821-22 (2007) (collecting cases); <u>State v. Abdullah</u>, 184 N.J. 497, 513-15 (2005) (when trial court has discretion to impose consecutive terms, taking into account specified factors, and sentencing scheme does not contain presumption in favor of concurrent sentencing, "the maximum potential sentence authorized by the jury verdict is the aggregate of sentences for multiple convictions"); <u>cf.</u> <u>People v. Foster</u>, 845 Ohio St. 3d 1, 20-22 (2006) (when statute requires concurrent terms unless court makes specified findings, <u>Blakely</u> applies to imposition of concurrent sentences).

Under California's sentencing scheme, when a person is convicted of multiple crimes, the sentencing court must direct whether the terms of imprisonment shall run

concurrently or consecutively.  Cal. Penal Code § 669.  Absent a direction from the court, the terms run concurrently.  Id.  In deciding whether to impose consecutive terms, the court need not make factual findings.  See id.; Cal. Rules of Court 4.425(a), (b); Black, 41 Cal. 4th at 822.  Instead, the court need only cite reasons for the sentencing choice, and in imposing a consecutive sentence the court need only refer to the primary factor or factors supporting its decision.  See Cal. Rules of Court 4.406(a), (b); Black, 41 Cal. 4th at 822.  Further, although concurrent sentencing is the default absent specification by the court, the sentencing scheme does not create a presumption in favor of concurrent sentences that may be overcome only by factual findings.  Black, 41 Cal. 4th at 822.  Accordingly, the maximum sentence authorized by the jury verdict is the aggregate of the individual sentences for each of the convictions.  See Id.  Therefore, because neither Apprendi, Blakely, nor any other Supreme Court case deals with the Sixth Amendment implications of consecutive sentencing, Petitioner cannot establish that the state court's decision was an unreasonable application of federal law as determined by the U.S. Supreme Court.

## Conclusion

For the reasons stated, the Court **ADOPTS** the magistrate judge's report and recommendation and **DENIES** Petitioner's petition for a writ of habeas corpus.

IT IS SO ORDERED.

DATED:  September 10, 2007

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:
All parties of record.

06cv0424